THE CITY OF GREENSBORO *v.* McGIBBONY.

1. Although the charter of a city may not, in express terms, confer the power or impose the duty of keeping the streets and bridges within the corporate limits in proper condition and repair, yet where the charter grants to the corporate authorities the power to "impose such taxes upon all the real and personal estate within the corporate limits of said city as they shall deem necessary for the support of the government of said city, or for other purposes, and . . . enforce the collection of the same"; and where these authorities have assumed and exercised corporate functions over the streets and bridges, and have negligently constructed or failed to keep in repair a bridge upon one of the public streets, whereby a traveler crossing the same sustains a personal injury, the corporation is liable to make compensation in damages, though no right of action be given by the charter or any statute. The right to redress for an injury occasioned by a defective structure erected and maintained by the corporation upon the public highway within the city, is a right derived from the common law, and may be recognized and enforced under the circumstances of the present case.

2. Where one is tortiously disabled by a personal injury and prevented from attending to his ordinary business for several weeks, he may be allowed nominal damages, at least, for his loss of time, although no definite evidence of the value of his time be submitted to the jury.

April 9, 1894. Argued at the last term.

Action for damages. Before Judge BARTLETT. Greene superior court. February term, 1893.

H. T. LEWIS, by brief, for plaintiff in error.
JOHN C. HART, by brief, *contra.*

LUMPKIN, Justice.

1. The plaintiff below recovered damages from the City of Greensboro because of personal injuries sustained by reason of a defective bridge in one of its streets. The defendant contended that it was not liable, because there was nothing in its charter imposing any duty whatever upon the municipal corporation with reference to keeping its streets or highways in repair, and that in a case of this kind the city could not be held responsible, because it is not made so either expressly or impliedly by its charter or by any general law. Under the facts disclosed by the record, we think the city was liable. We have carefully examined the act of March 5th, 1856, incorporating the City of Greensboro. (Acts of 1855–6, p. 342.) That act confers upon the mayor and aldermen the power to remove all nuisances and obstructions in or upon the streets, and also "all the rights, powers and authorities that are now vested in the commissioners of the town of Greensboro." Accordingly, we took the pains to examine all the acts of the legislature relating to Greensboro, passed before the act last mentioned. The act of December 16, 1815, provided "that the commissioners of the town shall have the entire control over all the citizens and hands who actually reside within the limits of the corporation, that are liable to work on the roads, for the express purpose of keeping all the streets of said town in good repair." With the exceptions above indicated, we find nothing in any of the several acts relating to Greensboro, including also those amendatory of the act of 1856, confering upon its municipal authorities any power, or imposing upon them any duty, with reference to the streets of the city. The mere power to remove nuisances and obstructions from the streets hardly imposes a plain and unequivocal general duty of keeping the streets in repair, and we do not think the provisions quoted from the act of 1815 con-

v 93-43

ferred any power, or imposed any duty, upon the com-
missioners of Greensboro, in their corporate capacity,
with reference to the streets. This provision amounted
only to a modification of the State's system of working
the public roads, so far as this town was concerned, by
making the town commissioners road commissioners in
place of the road commissioners appointed in the usual
manner. It cannot, therefore, be fairly said that the
charter of Greensboro, in express terms, confers upon
the municipal authorities the power, or imposes upon
them any corresponding duty, of keeping the streets and
bridges within the corporate limits in proper condition
and repair. Inasmuch, however, as the charter does
grant to the corporate authorities the power to "impose
such taxes upon all the real and personal estate within
the corporate limits of said city as they shall deem
necessary for the support of the government of said
city, or for other purposes, and . . [to] enforce the col-
lection of the same," we do not think, viewing this in
connection with the other provisions of the charter, there
was any undue assumption of authority by the mayor
and aldermen in taking and exercising corporate func-
tions over the streets and bridges of the city, as the
evidence shows they undoubtedly did. Indeed, usually
one of the main purposes of incorporating a city is to
secure safe, convenient and well-kept streets and side-
walks; and to this end, their charters generally in ex-
press terms invest the municipal authorities with some
control over the streets, and impose upon these author-
ities the duty of keeping the same in repair. We
cannot well doubt that, in procuring a charter for the
City of Greensboro, these things were in contemplation,
though the language of the charter contains so little
with reference to these matters. It is clear, however,
that the mayor and aldermen, as evinced by their con-
duct, acted upon the idea that they had the power to

exercise corporate functions over the streets, and the taxing power conferred upon them is broad enough to afford the means of carrying this power into effect. Dealing with them from their own standpoint, assuming that they usurped no authority in the premises, and bearing in mind that they actually did assume and exercise control over the streets, we are of the opinion that the municipal government should be treated as if the power above mentioned was expressly conferred upon it by its charter. At any rate, it does not lie in the mouth of these authorities to claim that the city is not liable because what they did was *ultra vires*. Upon the assumption that they were properly exercising corporate control over the streets and bridges, we will now endeavor to show that negligence on their part in constructing, or failing to keep in repair, a bridge upon one of the public streets, whereby a traveler sustained a personal injury, would render the corporation liable to make compensation in damages.

"In so far . . . as they exercised powers . . . voluntarily assumed—powers intended for the private advantage of the locality and its inhabitants—there seems to be no sufficient reason why they should be relieved from that liability to suit and measure of actual damage to which an individual or private corporation exercising the same powers for purposes essentially private would be liable." 15 Am. & Eng. Enc. of Law, p. 1141. "Persons or corporations that voluntarily assume and undertake the performance of a work, even though it be *quasi* public in its nature, ought to be held to impliedly contract that they will exercise due care in its performance, and for a neglect in this respect should be liable for the resulting damage." City of Galveston *v.* Posnainsky, 62 Tex. 118, s. c. 13 Am. & Eng. Corp. Cas. 484. In *Parker* v. *Mayor & Council of Macon,* 39 *Ga.* 725, BROWN, C. J., said: "As the

charter of the city of Macon confers upon the mayor
and council full power and authority to keep the streets,
lanes, alleys, sidewalks and public squares of the city
in good order, and to remove any buildings, posts, steps,
fences, or other obstructions or nuisance, which is a
power conferred upon public officers for the public good,
it is their duty to exercise it, and to keep the streets,
lanes, alleys and sidewalks in such condition that per-
sons passing over or along them may do so with safety
and convenience.    To this end it is the duty of the city
authorities to remove any nuisance from the streets or
sidewalks; and anything that endangers the life of any
person passing along the sidewalk is a nuisance which
they are bound to abate." The principle deducible from
this language is, that a power conferred upon the mu-
nicipal authorities for the public good carries with it
the corresponding duty of exercising that power for the
public welfare.    It has already been shown, we think,
that a power voluntarily assumed and exercised carries
the same consequences as a power expressly conferred.

"Municipal corporations, such as cities, towns and
incorporated villages, are generally held to be under a
duty to construct bridges built by them so that they
shall be reasonably safe for passage, and to so maintain
such bridges, and those under their dominion no matter
by whom they were originally constructed, as that they
shall be reasonably safe for travel by one who uses or-
dinary prudence and care.    By bridges under the do-
minion of municipal corporations, we mean such as they
have full control over and for the maintenance of which
they may rightly use the corporate funds.    It results
that if there is a legal duty, the negligent breach of it
renders the wrong-doing corporation liable to an action
by one who sustains a special injury.    In those jurisdic-
tions who do not recognize the New England rule, there
can be no question that if there is a liability respecting

streets, so, also, must there be a liability for defective bridges. The basis of municipal liability for defective bridges is essentially the same as that respecting streets; the corporate responsibility is commensurate with the corporate duty and power." Elliott on Roads & Streets, page 44. See, also, Bishop, Non-Contr. Law, sections 757 and 758. From the latter section it will be seen that the authority to raise the money required to keep the public streets in repair has much to do with the question of determining the liability of the municipality. And to the same effect, note the language of Judge Cooley, quoted by Slayton, J., in City of Galveston *v.* Posnainsky, *supra*, on pages 494 and 495. It matters not, we think, that for such an injury as that sustained by the plaintiff in the present case, no right of action is given by the charter of the city, or by any statute of this State. The right to redress for an injury thus occasioned is derived from the common law. The existence of this common law liability is now recognized in Alabama, Colorado, Dakota, Delaware, District of Columbia, Florida, Georgia, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, North Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Texas, Utah, Virginia, Washington and West Virginia. Jones on Negl. Mun. Corp. §53 and cases cited.

2. It appeared that the plaintiff, by reason of the injury received, was disabled and prevented from attending to his ordinary business for several weeks. The court, among other things, charged the jury: "In the event you find the plaintiff is entitled to recover at all, he is entitled to recover damages for loss of time, if he lost any." It is alleged that this charge was erroneous, because the evidence showed that the plaintiff's time was worth nothing. We think there was evidence that the plaintiff's time was of some value, though upon

this point the evidence was not very definite. At any rate, the plaintiff was entitled to at least nominal damages for his loss of time, and the jury, in estimating the damages, very probably did not allow him any considerable sum on this account, the verdict, in view of the entire evidence, being quite reasonable in amount.

*Judgment affirmed.*